Thank you, Your Honor, and may it please the Court, Richard Deering, for the Board of Education. I'd like to focus here on two related errors of back pay methodology made by the Special Master Industry. Two issues, both squarely teed up by the Board and its expert at the very outset of the back pay phase in this case, back and forth over several months, culminating in rulings by the Special Master and then the District Court that rejects use of class-wide comparator-based statistics in favor of individualized determinations on two key components of back pay. The first is likelihood of non-appointment, that's the demonstrated rate at which similarly situated persons who pass the challenge test nonetheless fail to obtain a full-time teaching appointment at the BOE school. The second is likelihood of attrition, that's the demonstrated rate at which similarly situated people departed a job as a full-time teacher with BOE. And the rulings on both these points violated two core principles under Title VII. The first is that they have no tethering to achieving a realistic aggregate result for the class as a whole. No core component of the methodology was reasonably calculated to achieve a realistic aggregate result. This Court in Ingram says that's critical, and the corollary to that principle is that a court should avoid awarding a windfall to the class at the expense of the defendant. Another point made squarely by Ingram. The second key principle, this was in the coinage of the Fifth Circuit in the Petway case where the Special Master and the court walked into a quagmire of hypothetical judgment. We are firmly in that quagmire here in this case. This is a class spanning about 4,500 class members, claims of back pay that go over about some two decades in counterfactual work history across 1,700 public schools in New York City, 1,700 different decision-makers at hiring and ongoing employment phases. Now the rulings were driven by two mistakes. One was to take the view that it just doesn't matter whether a class receives a windfall at the expense of DOE, that Title VII principles just are indifferent to that result. That's simply not true. Again, Ingram shows that. And the second is a misunderstanding of the so-called wrongdoer rule under Title VII. That is a driver of the errors made here at the methodological stage and a misunderstanding that sort of echoes and resonates throughout this case as the Special Master has approached back pay ruling. And the error that was made is that the wrongdoer rule or the principle of uncertainty or whatever you want to call it is not a basis to achieve a unrealistic aggregate result for the class. That's what the cases that we cite show. And relatedly, it is not a basis to adopt a methodology that's not reasonably calculated to achieve a realistic aggregate result for the class. And in fact, two of the cases that we rely on, on this point, expressly recite the wrongdoer principle when they lay out the general framework for analysis. That's Pettway itself and Seventh Circuit decision in Stewart. And yet they adhere to the point fundamentally that we make, which is that particularly in a class action, particularly in a very complex case, the methodology needs to be reasonably calculated to achieve an aggregate, a realistic aggregate result. And so, to take the wrongdoer principle to the point that the Special Master and the District Court took it here as a basis for essentially what amounts to ignoring two substantial and necessary reductions to back pay that are needed to achieve a realistic aggregate result, the Special Master and District Court clearly erred. And I just want to... Judge Wyeth, do you have any questions? Yes. Yes, I do. Thank you, Judge Katzmann. And thank you, Mr. Gehring. You know, this is a complex case, I agree with that, and there seems to have been a slowly developing quagmire based on my reading of the record, Mr. Gehring, and I appreciate your arguments relating to both the windfall, what you call the windfall rule, and as well as the arguments relating to the wrongdoer uncertainty rule, but what I think I need help with, understanding that there may be a difference between the aggregate back pay results and maybe these individual hearings, is that there was a Special Master who was There's a district court, very well-respected district judge who has made a series of findings, and I believe, but you can correct me if I'm wrong, that the current standard of review for us on appeal for this award, I guess in the aggregate of back pay, is whether the was clearly erroneous in its factual findings, and whether it abused its discretion to locate a just result, and so I may have, I may agree with you that if I were the district court judge or that if I were the Special Master, I would have perhaps done something a little different. I'm not saying I agree or disagree with you, but that's debatable. How in view of this standard of review, how do you prevail? That's a, you know, what's clearly erroneous here, or am I missing something? No, I think you frame a critical point, and I'll address it as squarely as I can, and the first point I just want to make is Ingram reversed a district court's back pay finding as an abuse of discretion. That's Ingram itself. Three other of the cases that we cite, Hamid, Petway, and Stewart, all opined on appropriate aggregate back pay methodology, appropriate use of comparative-based statistics in the first instance before a district court had ruled, and were criticized in two of those opinions, the majority was criticized by a dissent, saying you shouldn't jump ahead of what the district court's doing here, and so I think what that demonstrates is that the principles we're relying on are legal principles about appropriate back pay methodology, and that to depart from those principles, to depart from them based on legal errors about the scope and meaning and import of the wrongdoer rule, to depart from them based on legal errors about the idea that avoiding a windfall is not an important concern under Title VII, those are reversible, and if I could just elaborate a little bit more, because I think that is enough, because the only way to, the best way, and the way the cases say, to achieve a realistic result is to have a reliable methodology, and the district court and special master departed from that here, and I think that's sufficient, but I'd also like to just talk a little bit about what's actually happened in this slowly unfolding quagmire where the parties have been mucking around, and the special master, and agreed, doing his level best, and admirable in many ways, mucking around through this quagmire for some period of time, and I want to identify two key points, and I think in a sense this was almost inevitable, based on the choice to adopt an unreliable methodology, based on the legal misunderstanding of the wrongdoer rule, but here's how it's gone. The first thing, the special master, in practice, has essentially collapsed, and I'm focusing here specifically on the attrition piece, because I think it's in some ways the most starkly evident part of it, he collapsed this very complex inquiry, this quagmire inquiry over how are you going to reconstruct 20 years of work history, something the plaintiffs themselves said was impossible in their class certification submissions, he's collapsed it really into a question about the class members' credibility, saying, look, if they assert in an affidavit that they would have worked at the BOE teaching for their entire career, and you don't choose to question that credibility, whether they're lying, that's enough. Mr. Doering, can I interrupt you at this point in asking for the presider's forbearance here? Of course. So, I take it that there are individual findings and hearings that have already been undertaken, is that correct? That's correct, your honor. Okay. Does the city challenge any of these individual probability of higher attrition findings? We challenge all of them. But on the actual findings with respect to individual livings? I think the point of... We challenge all of them. The point of the... We challenge all of them because they all stem from the same fundamentally unreliable methodology, meaning you're in the quagmire of hypothetical judgment that the point of Patway and all these other cases is you avoid that quagmire, you avoid it by taking refuge in the... No, no, no. So, I'm working ahead, I guess. Now that you are in the quagmire, and now that you have these individual hearings and findings, has the city challenged... Understanding that you've got these higher order objections, has the city challenged any of those findings is clearly erroneous. I think we've... Yes. I think it's sufficient in this court that we have challenged the methodology as legally wrong and inappropriate, and that that methodology infuses and results in... Makes infirm all of those findings, at least insofar as our attrition and non-appointment objections apply to those findings. We've identified in our appellate brief which cases are subject to those findings. But the point is clear, you adhere to an unreliable individualized methodology, go into the quagmire, and you will... That is the error, and you will yield unreliable results. And just to sort of button up the point about how this has become, in a sense, a proxy battle about credibility, we have no interest, nor do we think it's constructive to challenge the credibility of class members. We're not here to say they're liars or bad people, or that they don't like children, or any of those things, because that's not the question. The question is, how do you sit back over 20 years of life history, work history, all the vagaries, all the ups and the downs that happen, what it means to go into the same job every day for a number of years, and the course of a career? The question of credibility, or whether someone's good or bad, is irrelevant to that determination. And that's why the statistics are the reliable guide, and the only reliable guide. May I follow up? And just a minute, I'll stop after this question, if you'll allow me. Sure. Of course. Although, you know, there are a lot of questions in this case. So with respect to the probability, or what you described as the likelihood of non-appointment, I'm interested in trying to better understand what the city makes of, or how it really responds to the existence of what I understand to be, to a bit, a surplus of teaching positions during the class period. Because if that is true, that is correct, if it was a surplus of teaching positions, then it seems to me to undermine, but I might be wrong about this, your very heavy reliance on this likelihood of non-appointment principle as a statistical matter. Can you just address that for me? Sure. Sure. And the short answer is that those statistics are derived from the very period in which those vacancies existed. What those statistics show is that notwithstanding those vacancies, 25% of similarly situated individuals who passed the last did not obtain a full-time appointment. That may be because the principal who sat across the table from them at their interview decided not to make them a member of that school's permanent staff. That may be because they lacked other requirements, of which there were, of course, significant, to obtain a full-time appointment or to retain one. There are any number of reasons. But I think this is an illustration of the point that intuition only takes one so far. And so, to the extent the district court's intuition was, well, there were a lot of vacancies and that means appointment was guaranteed. Looking at the stats show that's not true, it refutes that point. And that's really, I think, exemplifies why using the objective stats, when you're talking about very complex, often subjective forms of decision-making that can't be reconstructed feasibly individually across a class of 3,500, 4,500 individual people. You're saying that there's a 75% chance of obtaining permanent teaching positions. Do you agree with that? That's correct. You used the 25% number, but it's a 75% positive, a permanent chance. Yes, my apologies if I made that mistake. It's a 75% chance, meaning a 25% chance that it would not result in a full-time. Correct. Okay. All right. Well, thank you very much. Judge Carney, any questions? Yes, I have a few questions. First, I wondered, Mr. Dearing, if you could give a concise definition of what it means to reach a realistic aggregate result. How do we determine what's realistic, in your view? I think the best answer to that is that the way to do it is to follow a reliable methodology. I think you put your finger on a very tricky question, which is just examining the result in a vacuum, especially when you're in this quagmire circumstance. It's very hard to tell whether the result is realistic, because you have nothing to measure it against. That's the reason why the key, the fork in the road, the key moment, is when you decide what methodology you're going to follow. That's the reason why. I'm going to interrupt then. You don't really have ... It's kind of in the eye of the beholder. We look at a method, and if we like the method, we decide that the result is realistic. Is that right? I think that's the best way. I mean, I think another way you could do it, which is a second possibility, is to ... But it's hard to assess until you have the full class in, is to look at the overall sweep of class members to whom these reductions should apply, or to whom the attrition non-appointment risks apply, and to determine whether the cumulative class Y award conforms to the probabilities that the data show. That is theoretically possible. Let me ask you that. That, to me, suggests that what is realistic is not a freestanding notion. It's just, do we like the method? I'd like to ask you a question about your expert's method, and the basis for his comparative group on post-appointment attrition. The plaintiffs say that Dr. Areth merely stated that he examined the experience of non-black and Hispanic teachers who were appointed permanent teachers, and looked at the proportions of them who left BOE employment. Of course, one might question whether non-black and Hispanic teachers would be leaving employment at the same rate as black and Hispanic teachers, given availability of jobs and other issues and behaviors, whether that's an adequate comparator. And they also say that Dr. Areth didn't state whether he considered age of non-class comparators or class members when determining post-appointment attrition probabilities. Could you address why Dr. Areth's assessment was actually a better model than, in your detailed analysis that the special master did? Sure. And I think the first key point is that those elements that you, both of those elements that you described in the original Areth attrition model are not present in the model that is in theory used, but never actually applied in practice. And so what ended up happening was that there was further work done to actually derive a model that was used, was developed actually here by the plaintiff expert, not by Dr. Areth. It is not limited, in my understanding, to non-black, non-Latinx individuals. And it does have age variation in the attrition probability. So both of those objections, or if, you know, I don't necessarily, I'm not admitting they're flawed, but if you think they're flawed, both of those facets have been addressed and rectified. But aren't you, but let me interrupt for just a second, but aren't you still saying that it's Dr. Areth's model that leads to the 25, to the reduction that ought to be applied class-wide for post-appointment attrition? Only in the roughest sense of the word. I think that if it were, when it went back on remand, we are fine and we have not challenged anything about the attrition probabilities that have been derived by plaintiff expert. If it went back on remand, we're happy to use those. We are, in some points in our brief, because we don't actually have access to the underlying model of plaintiffs at this point, at some points in our brief where we try to give a rough cut estimate of the kinds of reductions we're talking about, we use our curve. But we are fine to use the plaintiff's curve and we haven't objected to it. And then on the second piece of your question about why isn't individualized better? I think the best and cleanest answer to that, and I hate to ring the same bell again, is the Quagmire point. And that when you're in the Quagmire, individualized determinations just have no reliable guide. And as Petway said explicitly, it's not just a point about aggregate. Even on an individual level, statistics-based findings are more realistic than individualized determinations. And I think that's clear. And the point I made about the special master turning this into a proxy battle about credibility, I think, demonstrates that. Another key point I'd like to make about the special master's model is that the way he drove the wrongdoer rule through this whole case is to say that any adverse fact that might cast some doubt on the idea that this would have been a person who worked 15, 20 years until they retired in the same BOE job as a full-time teacher, any contrary fact that he said in response to those, and actually this is not illogical as far as it goes, but it produces an unacceptable result. He says, well, you can't assume that would have happened the same way if they hadn't suffered discrimination. I take the point, but if you take that logic and you drive it through all of these individualized determinations, what you're setting up is fundamentally an asymmetric inquiry, an inquiry where an assertion made by the class member plus some minimal corroborating fact, like I took the exam several times, is enough, and adverse facts are essentially ignored because of this wrongdoer rule, this principle that they may not have unfolded the same way. And when you have, so the wrong methodological choice was made at the outset. It's predictable that it's going to result in a flawed methodology, and it in fact has. It's become a proxy war about credibility, something it shouldn't be, and that we frankly don't have any interest in trying to discredit these class members or malign them in any way, and it's become a fundamentally skewed and asymmetrical inquiry driven by the wrongdoer rule to permeate constructing 20 years of counterfactual work history. Again, something plaintiffs themselves at the class search stage said is impossible. If you could just clarify one thing for me, and then I'll be through. So looking at your reply brief, I'm looking at a paragraph that says that the plaintiffs mischaracterized the record in claiming that the Board of Ed conceded it had no objection to the special master's approach on post-appointment attrition. You say, to the contrary, BOE does object and did object, contending that the special master's approach would result in unlawful windfall for the plaintiffs. But I thought I understood you to say that the special master's methodology on looking at the curve on attrition and kind of applying that to the aggregate of the individual assessments, that you have no problem with that, that it was just kind of a variation on your expert, Dr. Arath's approach. What am I garbling here? Sure, sure. I'll try to draw the distinction that I admit has not been clearly drawn until now, and I'll try to clear it up as much as I can. What I'm talking about is the problem. What we don't object to is the sort of, for lack of a better word, the curve of attrition probabilities that plaintiff's expert has developed in the course of the back and forth over this issue. So, you know, and that curve, you know, meaning it includes similarly situated individuals, not limited to non-Black, not limited to non-Latinx, and it is age dependent. We don't object to that element. So, when you go down in the end to looking at the actual numbers of probabilistic reductions in that curve, we have not raised a challenge to that, and we are fine with that. But what we do object to, have consistently objected to, and what this appeal fundamentally is about is something else, which is the methodology of how to apply that, when to apply it, how to regard that curve. The special master on attrition, on appointment, he just threw it out the window. On attrition, what he said was, I'm going to consider it really as a starting place, but I'm going to still engage in an individualized inquiry. The point being, once you go down that road of individualized inquiry, you are wading directly into the quagmire. It might have been different if what he had said was, I'm going to allow for an exceptional showing one way or the other by either party, but that's not what he said. He had no methodology, no element of his methodology that was oriented towards something that was in the aggregate realistic, and as it has played out in the points I'm making, which I think was foreseeable and indeed almost inevitable from the outset, the attrition probability, he has followed this credibility plus, this intent plus, dismissed contrary evidence approach. He has applied the attrition probabilities in zero of the 347 cases that are up on this appeal, and that piece of it, that methodology that was reached by the special master where he was not guided by the Petway principles, by the Ingram principles, by Hamid, this consistent line of cases, that is what we object to in this appeal, and what we contend is erroneous. Thank you for the clarification. Judge Kastner, can I follow up on that? Yes, go ahead. With apologies. So, Mr. Dearing, you're focused on the attrition probability that Mr. Sickert employed, and you've got a view about the propriety of how he employed it in individual cases, but on the appointment probability, as I understand it, he more or less threw that out the window because it failed to account, as you and I discussed, for surplus in teaching positions. What's the issue there in terms of actual application to individual cases? You're right. Your Honor, there is no further complexity there. It was a mistaken decision to throw that out. It should have resulted in a reduction across the board in these cases subject to it, and that was the error there. Okay, thanks. If there are no further questions, I'll wait for my rebuttal. Thank you so much. No, this is Judge Kastner, and I have a few questions. Sure. It seems to me that the legal rule which you are advancing is that class-wide back pay calculations are required where individualized determinations are either impractical or impossible. What I'm having trouble understanding is, and I must be missing something, but I thought that the Board of Education itself had advocated for individual back pay determination in this very same litigation. Yes, I think there's two key points to respond to. Is that a yes or a no? I think it's a yes with some explanation. I think it's a fair statement, Your Honor, that the Board did advocate for individualized determinations at the class certification stage, and if I may, I'd like just an opportunity to try to explain that and explain why it's not of any consequence for the purpose of this appeal. I think there are two real pieces of that, and the first, what I just want to stress is that there will still be individualized back pay determinations. There are components, including the start date, including mitigation, other things that will always be individualized, including, in some respects, how far down the attrition curve individual class members go. Those will still be individualized. What we're talking about is components that are important of that award that cannot reliably be determined on an individualized basis. So I just want to make that point clear. The second point, though, about what happened prior to the class certification. I think the clearest way to understand that is that we opposed class certification on the idea that these needed to be individualized issues predominated. We lost that. The district court certified a class, certified it on the premise that class-wide issues predominated. And once that happened, we determined how to appropriately calculate back pay to litigate this as a class action. And that's what we did. And at the very outset of that phase of the case, we made clear our position, supported by our experts' analysis, that on these two key points, not appointment and attrition, that these statistical methods were the only reliable way. I think the bigger problem here, the bigger... Back to Judge Loyer's questions at the very beginning. When we think about the standard of review, the question is one of whether the findings were clearly erroneous, whether the individual determinations were practicable, whether they were outside the range of permissible decisions. And that's what frames our view, for the most part. You're absolutely correct, Your Honor. And as I said before, Ingram reversed the district court on back pay under the same principles we're alluding to here. Three of the cases we rely on, Petway, Hamid, Stewart, found other errors in the district court's analysis and said, by the way, when you do this on remand, you need to obey these core principles. So I think the bottom line there is that this is not within the range of permissible judgments under Title VII. The fundamental question, whether you're going to adhere to a reliable methodology in the circumstances of a case like this, that's a legal question. Or at a minimum, a failure to have any element in the methodology that has a check against or guardrail against or guided by principles of aggregate fairness or realism in a situation like this is an abuse of discretion. And if I just see if I can continue, please. Absolutely. Apologies, Your Honor. You've answered very fully and helpfully to the court. You've been given time way above your time. We thank you for your full attention and consideration. But I want to finish some of my questions. I'm still having difficulty as well. And this goes to Judge Carney's point. Why should BOE's comparator-based damage projections, which, when one thinks about it, are really themselves a form of speculation, be the measure of the fairness of individualized proceedings? Well, I think the core of it is that I don't think they're the measure of speculation. And that's why these cases repeatedly return to this point, that this is the best way. When you're tasked with something that's very challenging, which is to reconstruct some hypothetical world, what we're talking about here is reconstructing it over a period of decades in a very complex set of life circumstances, job circumstances, individual circumstances. As Petway put it, I think most eloquently, that use of comparator-based statistics, guiding it by comparator-based statistics, is more realistic than anything individual determinations could achieve, even on the individual level. And bolstered by the additional principle that it has an appropriate safeguard to reach an aggregate result that's realistic. And that second piece on the aggregate result is really informed, I think, by something like the law of large numbers in a case like this one. You get to a 4,500-member sample size, and you would expect to understand that you're very closely approximating the comparator-based analysis. And I think those two somewhat related and mutually reinforcing principles are the key reason why this is not speculation. And in fact, this is the path out of the quagmire. This is the refuge in a case that presents such complex and almost imponderable levels of hypotheticals. And not to put too fine a point on it, but if we want to talk about variations between what happened pre-class certification and what happened post-class certification, the plaintiffs themselves in class certification said it is impossible to reconstruct two decades of work history. They cited the quagmire principle explicitly. They cited Pettway. They cited Ingram. They cited McLean, three court cases that we rely on. And so – and they won on class certification. And in some ways, the deeper question is having – we lost. So we lost. We, I think, had the right to go to the drawing board and figure out how we're going to make this work as a class action. They won. And the harder question – Let me ask you – let me ask you a final question. I had – I think we have your fully developed argument on that point. On the – going back to the wrongdoer rule, in general, you don't contest the validity of that rule, as I understand it. And you would say that in its application that the Board of Education was not a wrongdoer or a bad actor. But the Supreme Court hasn't long held that a plaintiff's entitlement, the full compensation under Title VII, doesn't turn on a defendant's bad face. Take, for example, the case of Ablamar Paper Company, 1975 case. Am I missing something? No, I don't think so. Why should the application of an evidentiary presumption aim to ensure such full compensation turn on BOE's good or bad face? I take your point. I think just to preface it very briefly, you don't need to reach that question to resolve the case because the special measure just took the wrongdoer principle, even assuming it applies, much further than is appropriate. And that's why you can see from Pettway, from other cases that recite the wrongdoer principle and still embrace comparator-based statistics in cases that are – you know, traditional cases of discretionary action by a defendant, that's enough to resolve it. But you're right that in Albemarle, the Supreme Court said bad face is not – the lack of bad face is not a basis to reject a back pay award. I think I have two responses to that. And the first, most critical one is this secondary argument we've made about the wrongdoer rule isn't about rejecting back pay entirely. It's about the fact that the wrongdoer rule, too, is a principle of equity and that it's appropriate in applying that rule to evaluate equity and that this case is an unusual one in that regard. It's not merely a question of lack of bad face. It's a situation where we were compelled to use this test by a facially neutral state licensing law. We had no discretion not to use it. We were on pain of losing billions of dollars in public school funding if we didn't use it. We also didn't develop the test or have access to information about the test development. And so I think those are really the ingredients of this argument about that piece of our argument about the wrongdoer rule. And just the last point, which is a coda to it, is that the Supreme Court and other courts have also recognized, although this is not about the wrongdoer rule, that true, lack of bad face is not enough. But there are situations like application of female protective statutes, some cases about actuarial differentiation between men and women under life insurance premiums. Those were determined to be discriminatory and inappropriate to be followed. But in those kinds of special situations, the court has sanctioned the idea that even a full award of back pay may be inappropriate at all. So, Albemarle is correct. You're correct about lack of bad face, but it is not a categorical principle, even as it applies to the question of awarding back pay in any amount. Well, now, thank you. We'll now hear from your adversary. You'll have two minutes in rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Joshua Sohn from the firm of Strzok and Levin, and I'm here today on behalf of the Appellees, the plaintiffs below. As this Court is aware, this case has been pending for 25 years. During this time, because of the Board of Education's discrimination and refusal to take responsibility for its conduct, thousands of teachers' careers have been disrupted or destroyed, and they are suffering. With their access to justice having been delayed for so long, many believe that it has already been denied. Nearly six years ago to the day we were last before this Court, and during that argument like today, the Board of Ed argued that it was innocent of wrongdoing in this case and shouldn't be held liable under Title VII. This Court correctly found then for the second time and should find again today for the third that this is simply not the case. Today, the Board of Ed advances additional arguments, which, if adopted by this Court, would send a perverse message to employers that runs contrary to the purposes of Title VII as reflected by its legislative history as well as the myriad cases applying its provisions. The record is clear that the Board of Ed engaged in a deliberate, calculated course of action with knowledge of the staggering disparate impact of the LAST on teachers of color. To address that harm caused by the Board of Education, the District Court and the Special Master painstakingly undertook individualized determinations of back pay as Title VII and this Court required. The Board of Ed didn't challenge this process in 2015 or 2016 when it was adopted and before it was implemented, but waited to see how it turned out. The Board of Ed has not actually challenged the findings of a single one of the 347 judgments on appeal today and under Sands v. Runyon, this Court's review of those judgments should be whether they were clearly erroneous. They were not and they should all be affirmed. Effectively, the Board of Education is arguing that because it discriminated against so many people for so long, it is somehow entitled to a discount when the damages it caused are calculated. The particular arguments that the Board of Ed raises to support this argument are entirely unavailing for the reasons that we explain in our papers, but there are a handful of issues I'd like to cover briefly today. First, regarding the probability of appointment, the District Court's finding that there were sufficient vacancies for all class members was not clearly erroneous. It was factually correct and supported by trial testimony. The Board of Ed cannot and does not dispute this fact. Instead, the Board of Ed argues that the District Court abused its discretion and the Board of Education by not applying the blunt instrument of an irrebuttable 25% discount off of a subset of the class's damages. The Board of Ed's argument is unsupported by evidence or legal precedent. Accordingly, the District Court's decision to follow Title VII and this Court's jurisprudence to apply a rebuttable presumption, they didn't just throw it out the window, that class members would have been hired is not and cannot be an abuse of discretion. It's consistent with this Court's decisions in Cone v. Westhaven and in EEOC v. Joint Apprenticeship and also consistent with the Supreme Court's decision in Walmart v. Dukes. Significantly, the Board of Ed did not attempt to rebut this presumption a single time in the 347 judgments before the Court today. Regarding post-hiring attrition, similar to the District Court's decision regarding a rebuttable presumption of attrition to every demand was not an abuse of discretion and the findings it resulted in were not clearly erroneous. Although I personally argued tooth and nail against the class-wide application of this presumption, the District Court's decision to use it was not an abuse of discretion. It was a considered choice, which the Board of Ed advocated for. In both of these instances, the District Court applied a rebuttable presumption against the That's not an abuse of discretion or erroneous. It is complying with Title VII to fashion individual relief for a 23B3 class. And to the extent that the Board of Ed now claims that any conclusions that can be drawn from extrapolating the results of these first 347 judgments for the class as a whole is simply wrong. First, it's important- Judge Loyer, do you have any questions? Yes. Thank you, Judge Katzmann. And thank you, Counsel. So, as I understand your argument, and I think as I understand what you're saying in one sense, at least with respect to the attrition rate, you do not dispute that that might be an appropriate methodology. But what I think you're saying is that here the Special Master, Mr. Sifrit, applied some form of that methodology. And in this case, across the whatever it is, 347 cases, he found in favor of the class number. Is that right? Or is that wrong? I'm trying to unpack your question, Your Honor. It's a complex question, but if you could just answer the question, yes. So, it is right that the default rule in every case is that the attrition curve is applied by the Special Master. And it is also true that in these 347, damages did run through the date of judgment for these individual class members. What's also true, though, is if we look at all of the judgments that have been entered, which this court can take judicial notice of, there have been 1738 judgments entered so far. And of those, there are 21% of those, or 357, where the district court didn't award any back pay. And then for the- How many? How many? 357, which is 21% of the judgments entered to date, the district court did not award any back pay. And of the 1,381 judgments where there was back pay awarded, the district court did not continue back pay through the date of judgment in 45% of those cases, or 630 of the 1,381 cases did not have back pay accrue full accrual through the date of judgment. So, what you're suggesting is a relatively, not fully, necessarily robust application of the attrition methodology in individual cases. Well, what I'm suggesting, Your Honor, what I'm suggesting, Your Honor, is that it is a case-by-case analysis, which is what Title VII instructs us is the right way to go and the preferable way to go. And what we see is there certainly are situations where the class members are able to rebut the presumption of attrition, situations where they are currently working for the Board of Teachers, where they're working at other school districts as teachers. But what we also see, and what we saw in some of the 347, and we identified these in our papers, are there also are situations where we undertake the factual investigation and back pay damages are cut off 100% early. So, if, for example, an individual teacher retired in 2005 or died in 2005 or became disabled in 2005, his or her damages end in 2005. Of course. And we don't, but we don't apply the attrition curve. And we could have, because if Mr. Gearing's argument is adopted, we would never look at these things, right? We would never look at these things because, you know, we can't know. And the only thing that we can be faithful to are statistics. And statistics say that despite the fact that this person died in 2005, they might not have, so their damages should continue. So, this is why actually the individual hearings are more accurate. And in the aggregate, we see that some people get higher damages because attrition is turned off. And for other people, we see they get lower damages because we put it in an earlier end date. So, you know, I come in, I think, to this oral argument, having a view that the standard of review, which is obviously very important, is a clearly erroneous standard of review, which is what I think you're primarily advocating. But what I think, but I want to hear your views on this, where I think we are is that the decision to use the methodology, whether it's right or wrong, or methodologies, at the individual hearing stage, as opposed to the class-wide stage, is subject to an abuse of discretion standard. And that's really what's before us. Would you agree with that? I'm not sure that I do, Your Honor. That is Mr. Deering's argument. And that, well, that resonates with me right now. So, why is that wrong? Well, first, I don't think it matters which standard of review this court applies. I think under either, the district court's careful consideration of the individual judgment should be affirmed. But even if it is abuse of discretion, the fact that there are other alternative choices doesn't make choosing one over the other an abuse of discretion, right? It requires that the decision rests on an error of law, clearly erroneous factual finding, or that the decision can't be located within the range of permissible decisions. And I think what we see, what we have the benefit of here, are certainly the 347 judgments before the court today, as well as the 1,738 judgments that the court can take judicial notice of, which makes very clear that none of the conditions for a finding of abuse of discretion exist here. That, in fact, this process is true to Walmart's teaching that individualized determinations of each employee's eligibility for back pay should be followed in a B3 class, and that's page 366 of the Walmart opinion. Stewart says the same thing, an individualized remedy should be utilized because it will best compensate victims of discrimination without unfairly penalizing the employer. That's at page 452. And that's an important point, too, here, because if you go class-wide and you just do aggregate numbers, you are guaranteed to undercompensate certain class members. You're guaranteed to overcompensate others. And in the aggregate, maybe it's right. But the city at no point before this appeal advocated for a calculation of an aggregate number against which we should check things, which they suggest they did in their papers. But it just didn't happen. It's never something that they advocated for. It's not something that we've done. In fact, they advocated tooth and nail for the individual determinations that they're complaining about today. They advocated for it. And so I think part of your point is that they then have got to accept the, I think Mr. Dearing described it somewhere as an asymmetric, I believe, inquiry. That is part of these individual hearings. Is that right? Well, what they're making clear is the argument is not it was an abuse of discretion. It's dissatisfaction with what they advocated for, how it turned out. Okay. Thank you. Thank you, Judge Getsman. Judge Carney? Yes. Judge Loyer has covered the areas that I was interested in speaking with Mr. Sohn about. So I will pass. This is Judge Getsman. Just a couple of questions. When we look at what other circuits have done, they've held that class-wide back pay calculations are most appropriate where, and I'm quoting from a Fifth Circuit case, the class is large, the promotion or hiring practices are ambiguous, or the illegal practices continued over an extended period of time. Why doesn't this case meet all those or most of those criteria, I should say? Well, Your Honor, there are a couple of things. I understand you to be quoting from Pettway from the Fifth Circuit. Since then, the Supreme Court's decision in Walmart makes pretty clear that for B-3 classes, individualized determinations are required. And Pettway also has sort of an interesting and strange procedural history, which makes it sort of an odd choice here as a case to rely on. That case dealt with a showing on a statistical basis that there was discrimination in the workplace in Birmingham, Alabama, dating back to before the passage of Title VII. So this was in the early 60s, right? And then the Alabama District Court found that there was disparate impact, but declined to award any damages in that case and awarded attorneys fees. The Fifth Circuit was giving guidance in that case where the class consisted of a group of Black workers who had established the fact that they had been discriminated against because of the use of statistics. So this is in that line of cases that Mr. Gearing talked about, like Hamid, and like Stewart, and like Ingram, where there were more applicants than there were vacancies. And so the court was saying to the District Court, you need to fix this. You need to award back pay. And the way that you should do it is, you know, on these basic principles. And it was not a situation where we have here where there were sufficient vacancies for every class member. So it's factually distinguishable. And that was also a B-2 class and this is a B-3 class. I have one last question. Um, going back to Ingram. Um, if you look at Ingram, it seems to involve situations where, at least hypothetically, there were more vacancies available than candidates. Am I correct in that? I don't think you are, Your Honor. As I recall, Ingram, there were seven vacancies for 18 class members. Okay, that's helpful. So the court was faced with how do you hack up the aggregate damages that those seven people, you know, would have been deprived of among the 18 applicants, right? And that's very different from the situation we have here, where the uncontroverted testimony at trial, and it supported a finding, is that there was a surplus of positions, anywhere from 8,000 to 13,000 vacancies for a class of, you know, somewhere between 4,000 and 5,000 people. That's very helpful. We'll now hear from your adversary, who has two minutes in rebuttal. Thank you, Your Honor. First, just to address Ingram, this is backwards, actually. In Ingram, there were far more vacancies than there were class members. There were about 40 or 50. I may have that number not exactly right, vacancies. There were 18 class members. What this court held in that case was, although it was quite possible, 18 out of 40 or 50 referrals, quite possible that all class members would have been hired as a matter of, you know, brute, what could happen in the world, that it was unrealistic to conclude that that would have happened. And so, instead, what the court did was use the percentage of African-American persons in the overall workforce and extrapolate that percentage and say, if we match that percentage in how we fill these vacancies, seven additional African-American individuals would have been hired out of a class that was 18. And so, it took the back pay award for the seven that it thought would have been filled those roles, figured out what that back pay award was, and did a 52% haircut across the board to the 18 class members based on that statistical analysis. It is not a more applicants and vacancies case. Neither is Hameed. We explained this very clearly in the reply brief. Neither is Hameed, which did something quite similar based on statistical analysis, and neither is Stewart. None of these cases fall into that description. Now, just to address this issue of all the all these judgments and to try to use some kind of back of the envelope calculation to say this seems kind of fair, you know, I just say that there's no way to do that reliably. The way to get a fair result is to have a fair methodology. So, for example, he says 357 judgments where no back pay is awarded. There's several of those judgments that happened before this appeal. We looked at those judgments. Almost all of those judgments were people who ended up passing the their counterfactual appointment date. It had nothing to do with non-appointment. It had to do with they actually succeeded in getting an appointment faster than the class wide analysis would have suggested that they would, and so they didn't get back pay, but that has no bearing on the points we're making in this appeal. The 630 where there's a cutoff prior to judgment, retirement, of course there's a cutoff at retirement, but the point is there's all kinds of forms of attrition that happen pre-retirement. The premise that everyone in this class would have worked at BOE until retirement is just not supported in the data. Mr. Dearing, isn't the special master in the context of these individual hearings considering all these issues? He is not. I mean, you may disagree at the end of the day, but what can you point me to to show that he is affirmatively failing to consider these issues? I think because when you're talking about the multitude of reasons why people leave a job, there is no workable. That is why we're in this quagmire over decades here. There's no workable way to sort through those issues in a counterfactual world across the class of this side. That is the definition of the quagmire that plaintiffs themselves admitted this case presented, and when he abandoned, it might have been true that the way we proposed wasn't the only way to do it. That's possible. There might have been other ways to do it, but to adopt a methodology that has no component in it, that checks for aggregate reliability, no component in it that attempts to frame a realistic way of sorting those questions out for the class as a whole is a flawed methodology and cannot be sustained for that reason. Thank you for your argument. Thank you both for your excellent advocacy. The court will reserve decision. We'll go to the final case on the calendar, Cuthill v. Pompeo.